IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA                                                                  PLAINTIFF

v.                                          No. 4:13CR00017 JLH

MICHAEL JAY ELLIS                                                                          DEFENDANT

## OPINION AND ORDER

Michael Jay Ellis has been indicted in a three-count indictment. Count 1 charges that Ellis knowingly and intentionally possessed with intent to distribute at least five grams but less than 50 grams of methamphetamine (actual), in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). Count 2 charges that Ellis was a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Count 3 charges that Ellis possessed a firearm in connection with a drug trafficking crime, i.e., possession with intent to distribute methamphetamine, in violation of 18 U.S.C. § 924(c)(1)(A)(I).

All three counts stem from a search and seizure at Ellis's residence on October 12, 2012. Law enforcement officers first conducted a protective sweep of the residence, during which one of them saw what appeared to be marijuana in plain view; and, thereafter, they conducted a full search and seizure in which methamphetamine and a firearm were discovered and seized. The government contends that both searches were consensual; Ellis contends that neither of them was. The Court has conducted an evidentiary hearing and, based on the evidence presented, concludes that both the protective search and the subsequent search were consensual.

At the evidentiary hearing, the government called five witnesses: Postal Inspector Mickey Schuetzle, Postal Inspector David Barrett, DEA Special Agent Thomas Fisher, Investigator John Bean of the Jefferson County Sheriff's Department, and Investigator John Hughes, who is employed by the Pine Bluff Police Department and assigned as a task force officer to the DEA. Ellis called two witnesses, himself and his girlfriend, Gabrielle Holmes.

In late September of 2012, the postal facility in Pine Bluff developed suspicion regarding packages that were being delivered to 704 Barrow Drive in Pine Bluff, addressed to Ellis. Those packages were brought to the attention of Schuetzle, who sought assistance from Fisher. Ultimately, it was decided that Schuetzle and Barrett would deliver two of those packages to 704 Barrow on October 12, 2012, and would conduct a "knock and talk" with Ellis. When Schuetzle and Barrett approached the residence, Fisher was watching from a nearby vehicle. Bean and Hughes, along with at least two other local law enforcement officers, were nearby but out of sight, ready to come to the scene when given notice by radio that it was time to do so.

When Schuetzle and Barrett knocked on the door, Holmes answered. They told her that they were from the post office and wished to speak with Ellis. Holmes called Ellis to the door and then receded into the interior portion of the house. The two postal inspectors invited Ellis outside, told him that there was suspicion that the two packages contained explosives, and then asked him to open the two packages, which he did. Both packages contained Damiana, which is a leafy substance that can be used to make tea but which also can be used as a precursor to make illegal drugs.

Barrett requested Ellis to step outside, farther from the door. Ellis began approaching Schuetzle, who asked him not to do that, and Ellis became nervous, reaching around his pants, pulling his pants, pulling his shirt. For safety reasons, Schuetzle put Ellis in handcuffs, explaining that he was not under arrest and that this was for his safety as well as Schuetzle's. Schuetzle then conducted a pat-down.

When Fisher saw Schuetzle handcuff Ellis, he decided that he and the other officers should go to the residence for support, and he called by radio to the local officers nearby.

When Fisher approached, he instructed Ellis to call Holmes to come out from the residence, which he did, and she did. Barrett asked Ellis if he had any weapons or anything in the house that

2

could be used to harm the agents, and Ellis stated that he had a gun underneath the mattress in one of the bedrooms. Barrett reported this information to Fisher.

According to Fisher and Barrett, Fisher requested permission to conduct a protective sweep for the safety of the officers, and permission was granted. Fisher testified that he first asked Ellis for permission to conduct the protective sweep, and then he asked Holmes, and both of them gave permission. Ellis and Holmes deny that permission was given for a protective sweep.

According to the government's witnesses, the local law enforcement officers conducted the protective sweep while Schuetzle, Barrett, and Fisher remained outside. Bean testified that he went into the master bedroom to make sure there was no one there, and while there he saw a glass jar containing marijuana in plain view on top of a dresser. Bean and Hughes both testified that Bean reported his finding to Hughes.

Holmes testified that only one officer went into the house during the protective sweep. The description she gave of that officer did not match any of the officers who testified at the hearing. Ellis testified that Fisher went into the house, alone, and conducted the protective sweep by himself. The testimony of Ellis and Holmes on this point is contradictory because Holmes described someone other than Fisher as the person who conducted the protective sweep.

After the protective sweep confirmed that no one was in the house and that it was safe to enter, Fisher requested Ellis and the others to move inside the house, which they did. The handcuffs were removed, and Ellis was again informed that he was not under arrest. After some conversation, Ellis was provided with a written consent-to-search form, which he signed. The form bears a caption, in all capitals, identifying the document as a consent to search. With the blank spaces completed and the form signed, the document authorized the four local officers and Fisher to conduct a complete search of the premises (the word *premises* is circled) at 704 Barrow Street, Pine

Bluff, Arkansas, and to take from the premises any letters, papers, materials, or other property that they desired to take. It also stated, "I understand that I have the right to stop this search at any time after my consent is given." Finally the form stated, "This written permission is being given by me to the above named officer(s) voluntarily and without threats or promises of any kind." The consent was signed by Ellis, with Hughes and Bean signing as witnesses.

Ellis testified that he did not understand when he signed the form that he was giving consent to search the premises. According to him, the "big guy" (which would be Hughes) slammed the form down in front of him and told him to sign it. Ellis testified that he was told that if he signed the form, the officers would take the marijuana and leave. He contends that he was induced to sign by false promises, that he was in custody, and that he believed that he would be released only by consenting to the form. He argues that these circumstances show that his consent to search was not voluntary.

Hughes denies that any false promises were made to Ellis, although he did tell Ellis that, if there was nothing in the house but marijuana, something could be worked out. He says that he read the entire form to Ellis and then gave it to Ellis so that Ellis could read it before he signed it.

The testimony of the law enforcement officers is more credible than that of Ellis and Holmes. At least seven law enforcement officers were on the scene. The testimony by Ellis and Holmes that only one officer went into the house to conduct the protective sweep is not credible. With at least seven officers available, it would make no sense for one of them to enter a house, alone, to ascertain whether persons were in the house who could present a danger. The unanimous testimony of all of the law enforcement officers was that Hughes, Bean, and the other local officers entered the house to conduct the protective sweep, while Schuetzle, Barrett, and Fisher remained outside. That testimony is logical and consistent. Furthermore, there is no reason for Bean and Hughes to testify

4

that Bean found the marijuana in plain sight, if in fact they did not enter the house, and, instead, Fisher was the one who entered the house and discovered it.  Moreover, Ellis's testimony that he did not understand that the document he signed was a consent to search is not credible, especially in light of the fact that the document bears a caption, in all capitals and bold letters, entitling it as a consent to search.

The following factors are relevant in determining whether a defendant's consent to a search was voluntary:

> 1) his age; 2) his general intelligence and education; 3) whether he was intoxicated at the time; 4) whether he consented after being informed of his Miranda rights; and 5) whether he was aware of his rights and protections due to previous arrests.  Other relevant circumstances include: 1) the length of time the subject was detained; 2) whether the officers acted in a threatening manner; 3) whether any promises or misrepresentations were made; 4) whether the subject was in custody or under arrest at the time; 5) whether the consent occurred in public; and 6) whether the subject was silent as the search was conducted.

*United States v. Comstock*, 531 F.3d 667, 676-77 (8th Cir. 2008) (quoting *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007)).  Although these factors are important to consider, they are not to be employed mechanically.  *Id*. at 677.

No witness testified at the evidentiary hearing regarding Ellis's age.  Holmes testified, however, that she and he take care of each other's children together, and it is apparent from Ellis's appearance that he is an adult with sufficient maturity to give consent, knowingly and voluntarily, to a search of his residence.  Holmes testified that Ellis can read and write, that he is intelligent, that he graduated from high school, and that he attended college but did not graduate.  During his testimony, Ellis appeared to be above average in intelligence and in education.  Ellis has some criminal history, though the extent of it was not explained.  The only testimony on that point came from Fisher, who testified that Ellis was on probation or parole from a prior conviction at the time

of the search.  Nothing in the evidence indicated that Ellis was intoxicated.  No officer acted in a threatening manner.  Ellis had been detained for a very few minutes before he executed the consent to search form.  When Ellis signed the consent form, he was in his own living room, the handcuffs had been removed, and he had twice been informed that he was not under arrest.  Ellis remained silent as the search was conducted, never attempting to revoke his consent, which is significant.  If he had believed that the intent of the document he signed was that the officers would take the marijuana and leave, it stands to reason that, when they did not leave but instead began searching, he would have protested; but he did not.

    Based upon all of the evidence, the government has met its burden of proving beyond a preponderance of the evidence that Ellis gave voluntary consent to the protective sweep and to the subsequent search.  Therefore, the motion to suppress is DENIED.  Document #26.

    IT IS SO ORDERED this 5th day of May, 2014.

    *J. Leon Holmes*
_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE